|  |  |
|---|---|
| **EDWARD A. COLLEY and FREDERICK D. MALCOMB, JR.**, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 15-cv-1385 (TSC) ) |
| **DEBORAH LEE JAMES** *Air Force Secretary, et al.*, | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION

*Pro se* plaintiffs Edward A. Colley and Frederick D. Malcomb, Jr. are retired Air Force officers who were instructors in an Air Force Junior Reserve Officer Training Corps ("AFJROTC") unit. The Air Force decertified Plaintiffs as AFJROTC instructors after it found that they failed to timely submit certain records. Plaintiffs unsuccessfully challenged the decision through an Air Force administrative process and subsequently filed this lawsuit against the Air Force and the two individual decision makers, seeking reversal of the decertification.[1] Plaintiffs bring claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*; the Privacy Act, 5 U.S.C. § 552a; the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*; the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.* and the Due Process clause of the Fifth and

---

[1]  Plaintiffs also named the Secretary of the Air Force and another Air Force official as defendants, but there is no indication these two individuals were involved in the decertification or the administrative process.

Fourteenth Amendments of the United States Constitution.[2] (Am. Compl. ¶¶ 194-96, 101-02, 203a, 222, 239a, 239c-239d, 242a).

Before the court are the following motions: (1) Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment or to Transfer Venue (ECF No. 6); (2) Plaintiffs' Motion for Preliminary Injunction (ECF No. 16); (3) Plaintiffs' Motion for Preliminary Injunction and Request for a Hearing (ECF No. 20); and (4) Plaintiffs' Motion for Telephone Status Conference (ECF No. 23).[3] For the reasons set forth below, the court will GRANT Defendants' motion to transfer this action to the Central District of California and DENY Plaintiffs' motions.

## A. BACKGROUND

Colley and Malcomb were employed by the Hart School District in Valencia, California as JROTC instructors. (Am. Compl. ¶¶ 19, 23-24). Pursuant to federal law, all JROTC instructors "must be certified by the Secretary" of that branch "as a qualified instructor" in areas such as leadership, civics and ROTC related topics. 10 U.S.C. § 2033(a). The Secretary for each branch of the military is responsible for "establish[ing] minimum acceptable standards for

---

[2] The court will dismiss Plaintiffs' Fourteenth Amendment Due Process claim because such claims are not actionable against the federal government. *See Peavey v. Holder,* 657 F. Supp. 2d 180, 186 n.6 (D.D.C. 2009) ("It is the due process clause of the Fifth, not the Fourteenth, Amendment that applies to actions of the federal government."), *aff'd,* No. 09–5389, 2010 WL 3155823 (D.C. Cir. Aug. 9, 2010).

[3] In response to the Air Force's Motion to Dismiss, Plaintiffs filed an Amended Complaint as of right, along with a 96-page response to the Air Force's motion. (*See* ECF Nos. 9, 10). Normally, this court would have found the Air Force's motion moot and ordered the Air Force to answer or otherwise respond to the Amended Complaint. However, because the Air Force raised a venue issue in their Motion to Dismiss, which remained unsettled despite the Plaintiffs' Amended Complaint and their response to the motion, the court ordered the Air Force to file a reply limited to Plaintiffs' venue arguments.

While Defendants' motion was pending, Plaintiffs moved for a preliminary injunction (ECF No. 16), which they later withdrew after filing a second preliminary injunction motion (ECF No. 20 p. 1), now fully briefed by all parties.

performance and achievement for qualified [ROTC] units." 10 U.S.C. § 2031(c)(1)-(3).

Consistent with this authority, the Secretary of the Air Force publishes AFJROTC "Instructions" that cover management of the ROTC units. "**COMPLIANCE WITH THIS PUBLICATION IS MANDATORY**" appears in bold near the top of those instructions. (AR 321, AFJROTC 36-2002; AR 275, AFJROTC 36-2001; AR 177, AFJROTC 36-2001).[4]

Although Plaintiffs are not Air Force employees, the Air Force reimburses the school district for part of Plaintiffs' instructor salaries. (*See* Am. Compl. ¶ 15). Air Force ROTC instructors must: (1) "meet the criteria established by appropriate instructions and meet certification . . . requirements to perform instructor duty"; and (2) "meet and maintain school and Air Force requirements and standards." (AR 331, AFJROTC 36-2002, ¶ 2.1.1; AR 339, AFJROTC 36-2002, ¶ 4.4). The Air Force's "Holm Center" or "Headquarters" ("HQ") manages instructor compliance and may decertify instructors "for cause." (AR 331, AFJROTC 36-2002 ¶ 2.1.2; AR 332, AFJROTC 36-2002 ¶ 2.2.2; AR 335-36, AFJROTC 36-2002, ¶ 3.1.1).

As part of the ROTC program, the Plaintiffs used school equipment, as well as the Air Force's "Automated Data Processing Equipment (ADPE)." (Am. Compl. ¶ 27). Plaintiffs admit that "[t]he Air Force requires accountability and safekeeping" of the ADPE. (*Id*. ¶ 28). Specifically, instructors must "conduct an annual AIM Inventory," which includes accounting

---

[4]  At various times during the incidents at issue, three versions of the Instructions were in effect. AFJROTC 36-2001 was issued on September 8, 2010, updated August 1, 2011, and then replaced by Instruction 36-<u>2002</u> on October 11, 2013. (AR 177, 320). Instruction 36-<u>2001</u> was re-issued on May 28, 2014, but it did not supersede Instruction 36-<u>2002</u>. (AR 275).
   The court will quote and cite to the instruction(s) in effect at the time of the relevant events. Additionally, when necessary to avoid confusion, the court will include the year in its citation to the 36-2001 instructions: the current 36-2001 instruction will be cited as "AFJROTC 36-2001 (5/28/14)" and the prior 36-2001 instruction will be cited as "AFJROTC 36-2001 (9/8/10)"

for all computers, projectors, and digital cameras.   (AR 206, AFJROTC 36-2001 (9/8/10) ¶ 13.4.5; AR 284, AFJROTC 36-2001 (5/28/14) ¶ 4.3.1).

1. **2014 PROBATION**

Malcomb claims that in January 2014, he sent the unit's AIM inventory to Amy Frasier, the Equipment Control Officer ("ECO"), via facsimile and email, after which he telephoned her to confirm receipt.  (AR 385-86, Malcomb Decl. ¶ 8; *see* AR 414).  Several months later, on March 7, 2014, the AFJROTC Director sent an email to all units with a subject line that included "Annual IT equipment account compliance" and an April 10, 2014 deadline.  (AR 149).  The email explained that ADPE accountability was an Air Force requirement that had to be completed by the deadline.  (*Id*.)  The email also indicated that each unit was required to submit four documents in order to be considered "compliant": (1) an equipment custodian appointment letter; (2) training certificates (one for each instructor); and (3) an AIM inventory.  (*Id*.)   The email further explained that a new submission process had been created in WINGS—a computerized software program—and instead of emailing or faxing their ADPE documents, all units had to upload documents to WINGS.  (*Id*.)

Despite this, Malcomb asserts that he took no additional action because he had faxed and emailed the inventory on January 20, and the March 7 email did not state that Plaintiffs were not in compliance.  (AR 414; AR 385-87 Malcomb Decl. ¶¶ 8, 24; Am. Compl. ¶¶ 51, 55-56).  Plaintiffs also claim they did not believe the email applied to them because they had already complied with the inventory submission deadlines found in Air Force Manual provision 33-153 ("AFM 33-153").  (AR 4, Colley Dec. ¶ 12; AR 386, Malcomb Decl. ¶ 12).  As the court will discuss below, AFM 33-153 apparently contained more general guidelines about ADPE accountability than did the AFJROTC instructions and the emails from HQ.

On April 7, three days before the deadline, the AFJROTC Region 4 Director emailed Plaintiffs and other units explaining that WINGS showed their units had not started their ADPE accountability, despite prior warnings that the April 10 deadline "was extremely important!" (AR 151). The units were warned that they should start the ADPE accountability process in order to "avoid any possible negative impacts." (*Id.*) It is undisputed that Plaintiffs were on spring break when the email was sent. (Am. Compl. ¶ 58).

The day after the deadline, April 11, the AFJROTC Director sent noncompliant units, including Plaintiffs', an email with the subject line: "**ADPE Missed Suspense.**" (AR 153) (emphasis in original). The email stated:

> On 7 Mar we notified you of an AF level requirement to account for all AF owned ADPE. You were given a suspense of 10 April to complete your inventory and update it in WINGS. As of today, 11 April, this requirement has not been completed for your ADPE account. . . .
>
> If you have not completed the suspense by 18 Apr, both instructors at your unit will be placed on probation until the unit's ADPE account is fully compliant. If you fail to bring the ADPE account within compliance by 30 Apr, both instructors will be considered for decertification.

(AR 153).

Although Plaintiffs were on spring break on April 11, the break ended on April 15, and both Plaintiffs saw the email upon their return. (*See* Am. Compl ¶ 58). Even though the email explicitly stated the recipient units were non-compliant, both Plaintiffs claim that, once again, they did not believe their unit was out of compliance because they had faxed and emailed the equipment inventory in January. (AR 4, Colley Decl. ¶ 14; AR 386, Malcomb Decl. ¶ 14).

On April 22, the Air Force placed both Plaintiffs on probation. (AR 155; Am. Compl. ¶ 61). In his email to the school principal and Plaintiffs informing them of the suspension, the Director noted that "[a]ccounting for ADPE is a strict Air Force compliance requirement. This is

an annual recurring requirement." (AR 155). Finally, he warned: "If the instructors fail to bring the ADPE account within compliance by April 30, 2014, [HQ] will initiate decertification actions for both instructors." (*Id*. 156).

Later that day, Malcomb emailed the Director, indicating that because the unit had previously sent the AIM inventory to ECO Frasier, he had thought his unit was "ahead of the game," but that he intended to submit another inventory. (AR 414). Malcomb also mentioned his "confusion on what documents were needed" and his discussions with Frasier about "how to upload [the documents] into WINGS." (*See id*.) Plaintiffs entered all of the required documents before the April 30 deadline and the Air Force subsequently removed them from probation. (AR 158).

The following month, the Director published a new set of instructions requiring that the units use WINGS to account for ADPE. (AR 275; AR 284, AFJROTC 36-2001 (5/28/14) ¶ 4.2.1). The instructions also required that instructors log into WINGS and the instructors' AFJROTC email account daily in order to remain current on all policies. (AR 299, AFJROTC 36-2001 (5/28/14) ¶ 7.2, ¶ 7.2.1).

## 2. 2015 DECERTIFICATION

On March 14, 2015, the Regional Director sent an email to the units providing instructions on how to determine whether they had complied with the ADPE requirements. (AR 160). Again, Plaintiffs contend that they believed the email did not apply to them because they were purportedly in compliance with AFM 33-153. (AR 5, Colley Decl. ¶ 24; AR 387, Malcomb Decl. ¶ 24). Plaintiffs also contend that the email was unclear because it was labeled as a "'reminder' with no reference to what it purported to remind [Plaintiffs] of." (ECF No. 10, Pls. Mot. to Dismiss SOF Response # 51) (hereinafter "Pls. SOF Resp."). Although Plaintiffs

admit Malcomb's email account was functioning, they defend their conduct in part by contending that Colley's email account was "inactive or closed" at this time. (*Id*.) (citing AR 506); ECF No. 22, Pls. Reply p. 12).

On April 6, 2015, the AFJROTC Deputy Director sent an email to all units about the annual inventory "suspense" date of April 10, reminding them that the annual equipment inventory "ha[d] Air Force Level interest." (AR 162)

Plaintiffs allege they were on spring break at the time the email was sent, and that Colley's email was deactivated. (Am Compl. ¶ 90; Pls. SOF Resp. #52) (citing AR 506). Although Plaintiffs admit there were no problems with Malcomb's email account, they claim he also did not receive the email. (ECF No. 22, Pls. Reply p. 12; Pls. SOF Resp. #52; *see* Am. Compl. ¶¶ 88-89, 95). They argue that even if they had received the email, they still were not on notice about the April 10 suspense date because, in their view, the suspense date conflicted with the published suspense date found in the recently published instruction, AFJROTC 36-2001 (5/28/14), which provided for submission of inventories between January 1 and April 30. (Pls. SOF Resp. #52; AR 284, AFJROTC 36-2001 (5/28/14) ¶ 4.3.1).

Spring break ended on April 12, 2015. (Am. Compl. ¶ 90). On April 17, the AFJROTC Director sent the units, including Plaintiffs', an email with the subject line in bold indicating a "missed suspense." (AR 165). The email informed all recipients that their unit had missed the suspense date and warned that if they did not comply by April 24, 2015, they would "certainly be placed on probation" and "considered for Decertification." (*Id*.) Recipients were asked to contact the Regional Director if they had already completed their ADPE requirements. (AR 165-66). Even though the Director sent the email to what appears to be Plaintiffs' unit email address, Plaintiffs assert they did not receive the email at the time it was sent. (Pls. SOF Resp. #53; *see*

Am. Compl. ¶¶ 91-95; ECF No. 20, Pls. Second Preliminary Injunction Br. p. 8) (hereinafter "Pls. PI Br.").

On April 24, 2015, Plaintiffs received an email from AFJROTC Region 4 Director, Wayne Barron, stating that their unit had not started its ADPE compliance and asking them to call his cell phone number. (*See* AR 168; Am. Compl. ¶ 97; AR 5-6 Colley Decl. ¶¶ 25, 28). Barron attached an email he had received from the AFJROTC Director, who warned "[t]oday is the last day to complete the suspense before probation and the AF suspense of 30 April (next Thursday) could generate some decertification[]s." (*Id*.) Colley claims that he "attempted to contact" Barron three days later, but was "unsuccessful." (AR 6, Colley Decl. ¶ 29).

On April 28, 2015, Plaintiffs uploaded their signed AIM inventory and equipment custodian appointment letter to WINGS. (AR 158; Am. Compl. ¶ 99). On May 7, 2015, Plaintiffs uploaded both of their training certificates. (AR 158).

As a result of their late submission of the training certificates, on May 18, 2015, Plaintiffs received a memorandum from AFJROTC Director Woods informing them that they would be "Decertified for Unsatisfactory Instructor Performance" effective the end of the academic year. (AR 95, 97). Woods noted that Plaintiffs had been placed on probation the previous year for failing to timely complete the ADPE suspense, "despite personal direction and phone calls from [the] Regional Director." (AR 95, 97). He concluded that Plaintiffs' continued inability to comply with AFJROTC requirements was a clear indicator of unsatisfactory performance and therefore justified decertification for failing to "meet the standards expected of an Air Force officer and an Air Force Junior ROTC instructor per AFJROTC 36-2002, paragraph 3.1.2.2.5."

(AR 95, 97).[5]  Finally, Woods explained that Plaintiffs could appeal pursuant to AFJROTC 36-2002 Section 4.7.2, which allows for an appeal filed within 15 days of notification regarding the decertification.  (*See id.*)

Plaintiffs filed timely administrative appeals, admitting that they had submitted their training certifications on May 7, but arguing that they had not violated the applicable submission requirements.  Specifically, Plaintiffs argued that they had complied with AFM 33-153, which they contend does not require submission of training certificates.  (AR 118-19, 121).[6]  Moreover, Plaintiffs asserted that AFM 33-153 does not impose an April 30 deadline, but instead requires that units perform an annual equipment inventory no later than 365 calendar days "from the date the commander signed the current inventory listing."  (AR 118-20).  Relying on AFM 33-153, Plaintiffs argued that they never failed to meet any mandatory deadlines.  Additionally, despite the explicit warnings in the emails about possible decertification, both Plaintiffs asserted that they "reasonably believed" the most serious sanction they faced for late ADPE submission was a frozen account and an opportunity to correct any deficiencies.  (AR 124, 137).

Two days after Plaintiffs submitted their appeals, the decertifications became effective. The following month, on June 30, 2015, AFJROTC Vice Commander Hoffman upheld the decertifications, finding that:

- Plaintiffs were decertified for failing to meet "the standards expected of an Air Force officer and an Air Force Junior ROTC instructor per AFJROTC136-2002, para 3.1.2.2.5 [the same provision cited by Woods], specifically for not

---

[5]  AFJROTC 36-2002, Sections 3.1.2, 3.1.2.2 and 3.1.2.2.5 provide that an instructor can be decertified for "willful misconduct," including a "[d]eterminaton by Holm Center/JR that an instructor's performance or conduct does not meet the duties, responsibilities or conduct of an [instructor] as outlined in Chapter 1."  (AR 336).  Chapter 1 requires, *inter alia*, that instructors "meet standards as prescribed by applicable Department of Defense (DoD), Air Force, AFJROTC and Holm Center instructions."  (AR 323-4, AJROTC 36-2002, Section 1.1.3).

[6]  AFM 33-153 is not a part of the Administrative Record.

complying with the AFJROTC requirements by failing to meet the ADPE suspense two years in a row despite being reminded by HQ AFJROTC."

- Plaintiffs were required to comply with both the AFM and AFJROTC instructions, and that the latter may be more restrictive than the AFM. Thus, Hoffman rejected the Plaintiffs' argument that they met their obligations because they complied with AFM 33-153.

- Although Plaintiffs had "substantially compl[ied] with HQ directives in general," they had failed to "comply with a specific and clear HQ AFJROTC direction two years in a row. Other instructors who have failed to meet consecutive ADPE suspenses have been similarly decertified."

- Plaintiffs were warned about potential decertification in both 2014 and 2015.

(AR 143-44, 146-47). Hoffman noted that it was not in the best interest of the Air Force to expend numerous hours sending multiple emails continually reminding instructors of their responsibilities. (*Id.*)

## B. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs ask the court to grant a preliminary injunction requiring the Air Force to set aside their decertifications. Injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation and citations omitted). Accordingly, "the decision whether to grant a preliminary injunction is a matter of discretion." *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011) (citation omitted). Preliminary injunctions "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citation omitted). The moving party must demonstrate: (i) a substantial likelihood of success on the merits; (ii) that he or she would suffer irreparable injury absent the requested injunctive relief; (iii) that the balance of equities tips in his or her favor; and (iv) that the public interest would be furthered by the requested injunctive relief. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiffs argue they are likely to succeed on the merits because they are innocent and because the Air Force violated federal law by revoking their AFJROTC certifications. The court disagrees and addresses Plaintiffs' claims and arguments below.

### A.     Paperwork Reduction Act

Plaintiffs argue that the decertifications were invalid because the Air Force's ADPE accounting requirements violated the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.* The PRA "prohibits any federal agency from adopting regulations which impose paperwork requirements on the public unless the information is not available to the agency from another source within the Federal Government . . . ." *Dole v. United Steelworkers of Am.,* 494 U.S. 26, 32 (1990). The statute describes these paperwork requirements as a "collection of information" 44 U.S.C. § 3501(1), which is defined as:

> "(A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency,[7] regardless of form or format, calling for either—
>
> **(i)**     answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons, <u>other than agencies, instrumentalities, or employees of the United States</u>; or
>
> **(ii)**     answers to questions posed to agencies, instrumentalities, or <u>employees of the United </u>States which are to be used for general statistical purposes . . . ."

44 U.S.C. § 3502(3) (emphasis added). Thus, only under special circumstances does the PRA limit the collection of information from U.S. government employees.

---

[7]   The term "agency" includes "military department[s]."   44 U.S.C. § 3502(1).

Where an agency seeks a "collection of information" as defined by the PRA, the agency "must submit [its] collection plan to OMB [Office of Management and Budget].'" *CTIA-The Wireless Ass'n v. F.C.C.*, 530 F.3d 984, 987 (D.C. Cir. 2008) (citing 44 U.S.C. § 3507(e)(1)). If OMB approves the plan, it issues a control number for the information collection request. *See United States v. Ionia Mgmt. S.A.*, 498 F. Supp. 2d 477, 488 (D. Conn. 2007)

If a "collection of information" has not been approved by the OMB, "no person shall be subject to any penalty for failing to comply" with the information request. 44 U.S.C. § 3512(a). The statute defines a "penalty" to include "the imposition by an agency or court of a fine or other punishment; . . . [or the] suspension, reduction, or denial of a license, privilege, right, grant, or benefit." 44 U.S.C. § 3502(14). As Plaintiffs point out, in addition to these statutory restrictions, the regulations further provide:

> Whenever a member of the public is protected from imposition of a penalty under this section for failure to comply with a collection of information, such penalty may not be imposed by an agency directly, by an agency through judicial process, or by any other person through administrative or judicial process.

5 C.F.R. § 1320.6(d).

Plaintiffs argue that because the AFJROTC instructions and emails from HQ did not contain OMB control numbers, the Air Force's requests for the training certifications and its deadlines violated the PRA, and that Plaintiffs were not obligated to submit the requested documents. Consequently, the Air Force cannot penalize them by suspending their certifications for failing to do so.

Recognizing that the PRA only limits the collection of information from "employees of the United States" in certain instances, Plaintiffs contend they are not government employees. Because the statute does not define the term, Plaintiffs cite to several other sources in support of their position—none of which are compelling.

First, Plaintiffs cite to the ROTC implementing statute, which provides:

Notwithstanding any other provision of law, a member employed by a qualified institution pursuant to an authorization under this subsection is not, while so employed, considered to be on active duty or inactive duty training for any purpose.

10 U.S.C.A. § 2031(e)(5). They also cite to the contract between the school and the AFJROTC, which provides that they are employees of the school district, rather than Air Force employees. (Pls. PI Br. p. 12). However, neither the ROTC implementing statute nor the school contract addresses whether an ROTC instructor is considered a government employee for purposes of the PRA. Thus, Plaintiffs' reliance on these two provisions is misplaced.

Next Plaintiffs cite to *Cavazos v. United States*, 776 F.2d 1263, 1264 (5th Cir. 1985), which involved the question of whether the government may be held liable for the negligence of JROTC instructors under the Federal Tort Claims Act ("FTCA'). That case is not applicable to the facts or issues here, and therefore does not provide any useful guidance on what constitutes a government employee for purposes of the PRA.

Although Plaintiffs are not government employees in a literal sense, the court remains unpersuaded that they can seek refuge in the PRA, given the unique facts of this case. The Supreme Court has described the PRA as limiting the collection of data from "the public." *Dole*, 494 U.S. at 32; *see also* 5 C.F.R. § 1320.6(d) (protecting the "public" from penalties associated with failing to comply with a data collection request) (emphasis added). In this case, however, the requested information was not sought from the "public." The Air Force is responsible for certifying Plaintiffs in their roles as JROTC instructors, who in turn must follow JROTC directives. (AR 331, AFJROTC 36-2002, ¶ 2.1.1; AR 339, AFJROTC 36-2002, ¶ 4.4). Additionally, the Air Force requires that the units provide military instruction, 10 U.S.C. § 2031(b)(3), and in furtherance of that instruction, the Air Force provides certain equipment,

which instructors are required to document and maintain.  While the Air Force does not compensate Plaintiffs directly, it compensates them indirectly because it reimburses the school district for a portion of their salaries.  (Am. Compl. ¶ 15).  Thus, even though they are not technically government employees, Plaintiffs' salaries are partially subsidized by the government, they are caretakers of government property, and they are subject to governmental laws and regulations.  As such, they are more akin to government employees than members of the public.

Moreover, as the Supreme Court has explained, the PRA limits the collection of information from the public when the information sought is available from another source within the Federal Government.  *See Dole,* 494 U.S. at 32, 38.  Here, there is no evidence that the AIM Inventory and training certifications are available from another source within the federal government, and a ruling in favor of Plaintiffs would jeopardize the federal government's ability to maintain and account for public property.

In enacting the PRA,

Congress attempted to create a legislative scheme and administrative procedures by which unnecessary and burdensome paperwork requirements would be substantially diminished, if not eliminated.

William F. Funk, *The Paperwork Reduction Act: Paperwork Reduction Meets Administrative Law*, 24 Harv. J. on Legis. 1, 4 (1987).  The documents and information sought by the Air Force in this case can hardly be described as burdensome or unnecessary.  Accordingly, Plaintiffs are unlikely to succeed on the merits of their PRA claim.

### B.    Administrative Procedure Act

The court reviews the Air Force's decertification decision under Section 706 of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 706.  Pursuant to the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion," "otherwise not in

accordance with law" "in excess of statutory authority," or "without observance of procedure[s] required by law." 5 U.S.C. § 706(2)(A), (C)-(D). The court's review is "highly deferential" and begins with a presumption that the agency's actions are valid. *Envtl. Def. Fund v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981). "In exercising its narrowly defined duty under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679 (D.D.C. 1997) (some citations omitted) (citing *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989)); *see Spadone v. McHugh*, 864 F. Supp. 2d 181, 187 (D.D.C. 2012) (citation omitted) ("A decision is arbitrary or capricious under the APA if an agency failed to provide a reasoned explanation, failed to address reasonable arguments, or failed to consider an important aspect of the case.").

### 1. Plaintiffs' APA Arguments

Plaintiffs "bear the burden of establishing the invalidity of the agency's action." *Magneson v. Mabus*, 85 F. Supp. 3d 221, 225 (D.D.C. 2015). Set forth below are the Plaintiffs' APA arguments, along with the court's analysis of each argument:

### a. Plaintiffs allege they complied with the operative AFM guidelines.

- Plaintiffs argue they complied with AFM 33-153, which requires submission of an AIM Inventory once every 365 days and annual certification of training, but does not require submission of training certificates. (Pls. PI SOF # 6). Therefore, their upload of the 2015 training certificates, on May 7 (after the April 30 deadline), did not violate Air Force guidelines. (*See* AR 158).

- Plaintiffs contend that the published policies can be "changed" only by rewriting the publication or issuing policy memoranda. (Pls. PI Br. p. 34). They also argue that ECO Frasier "is the only individual who is empowered by Air Force regulation to direct ADPE compliance." (Pls. PI Br. p. 7 n.8).

- Plaintiffs argue that because the emails from HQ contained due dates and a training certificate documentation requirement that purportedly conflicted with AFM 33-153, they had no obligation to follow the directives in the emails.

- Plaintiffs also contend that they were not bound by AFJROTC 36-2001 (5/28/14) ¶ 4.3.1 (one of the provisions Hoffman cited in her denial of the appeal and which requires submission of the AIM documents by April 30), because it purportedly conflicts with AFM 33-153. (Pls. SOF Resp. #52; AR 284; AR 143). They also argue that even if they were bound by AFJROTC 36-2001 (5/28/14) ¶ 4.3.1, they complied because they submitted their inventories in a timely fashion.

Plaintiffs' argument that they are bound only by the AFM guidelines is unpersuasive. As an initial matter, the AFM is not part of the Administrative Record ("AR"), and therefore this court does not know precisely what the AFM provides, nor the extent to which it applies to ROTC units. In contrast, the AFJROTC instructions appear in the record and the first page of each version indicates that they are published "By Order of the Director Air Force Junior ROTC" and that compliance with the instructions is "Mandatory." (AR 320, AFJROTC 36-2002; AR 275, AFJROTC 36-2001 (5/28/14); AR 177, AFJROTC 36-2001 (9/1/10)). The court is unable to find a reason to conclude that, as a representative of the Air Force Secretary, the Director of the AFJROTC lacked the authority to publish AFJROTC Instructions, even if they are narrower than the provisions in the AFM.

With respect to the emails from HQ, the court is unpersuaded by Plaintiffs' argument that Air Force guidelines prohibited the Director from issuing the emails. Citing AFI 33-360 (a different publication than they cited previously), Plaintiffs point to a provision indicating that changes to Air Force "policies, guidance or procedures found in official publications" can only be made by publication of rewritten polices, interim guidance, Air Force Policy Memorandum and other official documents, while changes by "other vehicles/mechanisms" are prohibited. (Pls. PI Br. p. 34).

However, Plaintiffs did not raise this argument in their administrative appeal. (*See* AR 117-141). Accordingly, it is not properly before this court because generally, "under the waiver doctrine, issues and arguments not made before the relevant military correction board or administrative agency are deemed waived and [cannot] not be raised in a judicial tribunal." *Christian v. United States*, 46 Fed. Cl. 793, 802 (2000) (citations omitted); *see also Spadone*, 864 F. Supp. 2d at 187 n.2 (refusing to consider claims not raised during the military administrative process).

Even if Plaintiffs had raised this argument, as noted above, the Air Force manuals Plaintiffs cite are not a part of the AR and there is nothing in the record explaining if and how the guidelines in those manuals apply to the AFJROTC. Indeed, the manual that contains the guidelines on how to change Air Force policies specifically references a list of Air Force publications found in "Table 4.1, Table 4.2, and processed IAW," but those tables are not in the record. (Pls. PI Br. p. 34). Moreover, it is unclear what constitutes a "change" to a policy. In this case, there is a reasonable argument that the emails did not "change" the requirement that units submit inventories between January 1 and April 30 yearly, but instead supplemented the written AFJROTC instructions by requiring training certificates. This court is not convinced that this type of supplementation is valid only when issued through a formal policy revision process.

Finally, Plaintiffs have cited no legal authority that suggests the ECO is the only person empowered to direct ADPE compliance. Thus, they have not met their burden of establishing success on the merits with respect to their arguments that they were not required: (1) to comply with AFJROTC instructions; (2) to comply with emails from the Director; or (3) to submit training certificates.

b.　Plaintiffs allege they complied with the training certificate submission
　　　　 requirement.

Plaintiffs point out that the AIM inventory they uploaded into WINGS prior to the April

30 deadline in both 2014 and 2015 contained an affirmation that they had completed training.

(Pls. PI. SOF # 8; AR 36, 54, 158).[8]  Therefore, they argue that they satisfied the requirement

that they submit "training certificates" by the same date.

Again, Plaintiffs did not raise this argument in their administrative appeal (*see* AR 117-

141) and, therefore cannot assert it for the first time here.  *See Christian*, 46 Fed. Cl. at 802;

*Spadone*, 864 F. Supp. 2d at 187 n.2.

Even if this argument were properly before this court, Plaintiffs have not pointed to any

Air Force directive to support their argument that the training certification language on the AIM

inventory satisfied the requirement to submit a "training certificate."  The existence of an AIM

inventory, separate from the training certificate, indicates that the Air Force did not consider the

AIM inventory a substitute for the training certificate.  Indeed, in the March 7, 2014 email that

Plaintiffs admit receiving, (AR 387, Malcomb Decl. ¶ 12; AR 4, Colley Decl. ¶ 12; Am. Compl.

¶¶ 56-57), the Director explained that ADPE equipment accountability compliance required

submission of the AIM inventory, as well as training certificates for both instructors.  (AR 149).

The following month, Plaintiffs were placed on probation and Malcomb subsequently discussed

---

[8]　Both Plaintiffs signed the AIM inventory form, which includes the following:

> I certify that I have reviewed the letter appointing the ECs reflected on this
> inventory account.  The information contained in the appointment letter is current,
> accurate, and complete.  The ECF have received the required training and have
> completed a physical inventory for all equipment under their jurisdiction.

(AR 36, 54).

with ECO Frazier his "confusion [regarding] what documents were needed and how to upload

them into Wings." (AR 414). Several days later, Plaintiffs submitted both the training

certificates and the AIM inventory prior to the April 30, 2014 decertification deadline. (AR

158). Accordingly, Plaintiffs knew in 2014 that they had an obligation to submit the training

certificates, in addition to their AIM inventory.

      c.   <u>Plaintiffs allege the 2014 probation was invalid</u>.

- Plaintiffs submitted their AIM inventory via email and facsimile in 2014 by January
  20, before the deadline. (Pls. PI SOF #7; AR 414; AR 385-87, Malcomb Decl. ¶¶ 8,
  19). At that time, there was no requirement that documents be uploaded to WINGS.
  (Pls. PI Br. p. 4 n.6). Therefore, Malcolmb claims that when he received the March
  7, 2014 email about uploading documents to WINGS, he took no further action
  because the email did not state that Plaintiffs were not in compliance, and Plaintiffs
  should not have been placed on probation in 2014 for failing to meet deadlines.
  (Compl ¶¶ 51, 55-56).

While Plaintiffs are correct that the WINGS upload requirement was not in effect when

they faxed and emailed their AIM inventory in January 2014, Plaintiffs should have been on

notice by mid-April that the Air Force was applying the requirement retroactively. Plaintiffs

admit that when they returned from spring break in April 2014, they saw an April 11 email. (*See*

AR 153, AR 4, Colley Decl. ¶¶ 14, 12; AR 386, Malcomb Decl. ¶¶ 14, 12). Because that email

specifically informed them that they had missed the April 10 ADPE suspense date, they were

therefore on notice that their January fax and email submissions had not been sufficient and that

they faced probation if they failed to take action by April 18. Yet, Plaintiffs ignored the warning

and instead waited until they were actually placed on probation to follow up. Plaintiffs' own

inaction undermines their argument that the Air Force acted in an arbitrary and capricious

manner when it: (1) warned Plaintiffs on April 11 that they faced probation if they did not

complete the ADPE suspense by April 18; (2) gave Plaintiffs four additional days beyond the

deadline in which to comply; and (3) placed Plaintiffs on probation after they failed to comply,

or even respond to HQ's emails.   The court finds they are therefore unlikely to succeed on their

argument that the 2014 probation was invalid.

> d.   <u>Plaintiffs allege they did not receive certain emails</u>.

- Plaintiffs note they were on spring break when emails dated April 7, 2014, April 11, 2014, and April 6, 2015 were sent.  (AR 4, Colley Decl. ¶ 13; AR 386, Malcomb Decl. ¶ 13. Amen. Compl. ¶ 90).

- Plaintiffs also allege that "Colley's AFJROTC email was either disabled or deleted by the Air Force" for "all of March and April 2015 . . . the email account did not 'exist.'" (Pls. PI SOF # 20) (citing (AR 506)).

- Plaintiffs argue that even if they had received them, the emails did not sufficiently inform them of the deadlines.

Again, Plaintiffs did not raise these arguments in their administrative appeal and

therefore they are not properly before this court.  *Christian*, 46 Fed. Cl. at 802; *Spadone*, 864 F.

Supp. 2d at 187 n.2.  However, had Plaintiffs raised these arguments, it is unlikely they would

have prevailed.  First, their contention that the emails did not sufficiently inform them of the

deadlines is not supported by the record.[9]

Second, Plaintiffs do not explain how being away during the break excused their failure

to meet the deadlines.  Plaintiffs acknowledge that in 2014, upon returning from spring break,

they saw an email—containing the subject line "**ADPE Missed Suspense**"—but they believed

the email did not apply to them, even though it clearly stated they were not in compliance with

the ADPE suspense and warned them that they would be placed on probation if they failed to

comply by a specified date.  (AR 4, Colley Decl. ¶¶ 14, 12; AR 386, Malcomb Decl. ¶¶ 14, 12;

AR 153) (emphasis in original).    They subsequently learned—well before 2015—that they were

incorrect.

---

[9]   Plaintiffs admit they received at least two emails that contained specific ADPE suspense deadlines.  (*See* AR 153, April 11, 2014 email; AR 168, April 24, 2015 email).

In 2015, the AFJROTC instructions required that Plaintiffs "log into WINGS and the instructor's AFJROTC.com email at least weekly." (AR 299, AFJROTC 36-2001 (5/28/14) ¶ 7.2.1). Thus, any failure to check their emails during spring break in 2015 violated Air Force instructions. Moreover, after they returned from spring break, Plaintiffs admit receiving an email from Regional Director Barron informing them they were not in compliance. (AR 168; Am. Compl. ¶ 97; AR 5-6 Colley Decl. ¶¶ 25, 28). Thus, Plaintiffs' argument that spring break prevented them from learning of the deadlines and requirements fails.

Plaintiffs' allegation regarding Colley's allegedly "disabled" email is similarly unpersuasive. First, the documents upon which Plaintiffs rely do not establish that Colley's email account was "disabled or deleted" through no fault of his own, but instead suggest that it was disabled due to non-use. (*See* AR 506). On May 11, 2015, Colley emailed HQ email support asking for a reset of his password. (*Id.*) HQ email support informed him that his account no longer existed, and that "[a]ll accounts are disabled after 45 days of inactivity." (*Id.*) Thus, it appears that Colley had not used his account in at least 45 days—since at least March 27, 2015, before spring break. Plaintiffs do not proffer any explanation for why Colley did not observe or address the email issue earlier, particularly given his obligation to log in weekly. (*See* AR 299, AFJROTC 36-2001 (5/28/14) 7.2.1). Nor have they asserted that Colley's email address was the only one to which HQ sent emails. Indeed, the record indicates that on several occasions, HQ sent emails to Malcomb or to what appears to be the unit email address. (*See* AR 151, 165-66, 168). Consequently, Colley's email problems did not excuse Plaintiffs' non-compliance with the suspense deadline and, therefore, Plaintiffs are not likely to succeed on their email arguments.

e. The Air Force did not give Plaintiffs advance notice prior to the decertification.

While the Air Force did not give Plaintiffs advance notice of the initial decision to decertify, it had warned them that they faced decertification and subsequently gave them notice of the decertification decision before it became effective. Plaintiffs were warned in 2014 that non-compliance "would" result in decertification, and in 2015 that they "could" be decertified if they missed the April 30 deadline. (AR 153, 155-56, 168-69; *see* AR 165-66). After they missed the deadline in 2015, Woods sent them a memorandum on May 18, 2015 informing them that they would be decertified "effective the end of the academic year." (AR 95, 97). Plaintiffs admit that the school year ended on June 4, 2015. (Am. Compl. ¶ 145). Thus, the decertification did not become effective with the letter from Woods.

Moreover, Woods informed Plaintiffs of their right to appeal his decision, pursuant to AFJROTC instructions, which allow fifteen days to appeal. (AR 95, 97). Therefore, Plaintiffs had through June 2, 2015 (two days before the decertification became effective) to file an appeal, which they did with the assistance of counsel. Accordingly, Plaintiffs had an opportunity to respond fully to the decertification decision before it became final.

f. Plaintiffs challenge the initial decertification decision by Colonel Woods, alleging that:

- Woods relied on false information when he claimed, in the decertification notification, that Plaintiffs had failed to meet the suspense deadline in 2015—despite personal direction and phone calls from Barron, the Regional Director. (Pls. PI SOF # 14) (citing AR 95, 97). Plaintiffs also appear to contend that Woods was informed of the purported telephone call via false "testimony" that Plaintiffs were not allowed to rebut. (Pls. PI. SOF # 13).

- Woods held a secret meeting, evidence of which is "compelling." (Pls. PI Br. p. 6 & n.7).

- Woods must have relied on undisclosed documents to reach his decertification decision, because Plaintiffs did not receive any documents when they requested them. (Pls. PI Br. p. 7-8 n.7).

Plaintiffs are unlikely to establish arbitrary or capricious conduct as it relates to Woods and the decertification decision. First, with respect to the alleged telephone call between Barron and Colley, Plaintiffs noted in their appeal that the telephone call never occurred and cited to emails from Barron admitting he had been mistaken about speaking to Plaintiffs. (AR 122; *see* AR 495, 508). Thus, Hoffman was fully aware that Woods had been mistaken and there is no indication that she relied on the alleged telephone call in deciding the appeal. Consequently, there is no evidence that the final decision was tainted by false information.

Second, the court disagrees with Plaintiffs' contention that there is "compelling" evidence of a secret meeting. (*See* Pls. PI Br. pp. 6-7 n.7). "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926). Yet Plaintiffs argue, without any evidence, that there must have been a secret meeting because "they were not notified" and "no written record has been provided . . . to substantiate [their] alleged failure to timely provide [ADPE] documents." (Pls. PI Br. pp. 6-7 n.7). These facts do not warrant such an assumption.

Finally, Plaintiffs provide no support for their allegation that Woods or any other official considered documents to which the Plaintiffs were not privy prior to filing their decertification appeals. This allegation appears to center around an email exchange between Plaintiffs and Colonel Scotty Lewis, who was the Chief of AFJROTC Instructor Management. (*See* Pls. PI Br. pp. 6-7 n.7; AR 511). After the decertification decision, Plaintiffs emailed Lewis to inquire what documents Woods had relied upon to reach the decertification decision. (AR 511). Lewis attached a copy of the 2014 probation email and explained that "missing [the 2015] suspense [deadline] is the only 'documentation' needed . . . [but] Wayne Barron may have a copy of the

actual dates utilized regarding your unit's specific situation as well as the emails sent by him and the headquarters." (*Id*.)   Relying on this exchange, Plaintiffs contend that "nothing in the AR provides any indication of what Mr. Lewis or Colonel Woods might have considered to reach the conclusions they did." (Pls. PI Br. p. 7 n.7).

The court finds this argument puzzling.  The AR is replete with emails from HQ to Plaintiffs about the suspension deadlines.  While Plaintiffs contend that they did not receive some of the emails at the time they were sent, there is no evidence in the record that Plaintiffs failed to receive relevant or material emails prior to the date they filed their appeals.  Indeed, Plaintiffs cite to many of the emails in their appeal letters.  (*See* AR 117-141; Amend. Compl. ¶¶ 88-89).   Finally, while it is clear that some of the documents contained in the AR were created after the decertification decision, Plaintiffs have not directed the court to any evidence that might suggest that Woods or Hoffman considered any relevant or material information of which Plaintiffs were unaware before they prepared their appeal letters.

g.  Plaintiffs challenge Hoffman's denial of the decertification appeal, claiming:

- On June 30, 2015, Hoffman presided over a "licensing proceeding" relating to the appeal, which they were not invited to attend.  (Pls. PI. SOF # 17).

- Hoffman added new charges in denying the decertification appeal, to which they were not allowed to mount a defense.  (Pls. PI SOF # 16; Pls. PI Br. p. 8).

- Hoffman ignored proof that Plaintiffs complied with the submission deadlines by submitting their AIM inventories in compliance with AFM 33-153 in 2014 and 2015.  (Pls. PI. Br. p. 8) (citing AR 408).

As with their claims about Woods, Plaintiffs have not pointed to any evidence in the record that Hoffman held a "licensing proceeding."

With respect to the new charges allegation, the record fails to support Plaintiffs'

contentions, and indicates that Hoffman relied on the same AFJROTC instruction as did Woods,

and responded to the arguments Plaintiffs' raised in their appeal letters.

Finally, as noted above, Plaintiffs' are unlikely to succeed on the merits of their argument

that compliance with AFM 33-153 alone was sufficient to avoid decertification.

h.  Plaintiffs allege that the sanction of decertification was too severe,
    claiming:

- Decertification was unauthorized, since the AFJROTC guidelines provide that
  the sanction for failing to meet ADPE deadlines is disabling a unit's account,
  thereby preventing the unit from ordering new equipment.  (Pls. PI SOF # 28;
  Pls. PI Br. pp. 33-34; AR 285 AFJROTC 36-2001 (5/28/14) ¶ 4.3.2).

- The "Chief of the Instructor Management Branch" sent Hoffman an email
  indicating that Plaintiffs were the only instructors "in [the Lieutenant's]
  records that [have been] specifically decertified for suspenses alone.  The rest
  were a combination of performance to include suspenses."  (Pls. PI SOF # 29).

Plaintiffs' arguments are not compelling.  First, while the ADPE instructions warn that

failure to comply with submission deadlines will result in a disabled account, the instructions do

not indicate that this is the only sanction.  Indeed, the AFJROTC Instructions allow for

decertification where an instructor fails to "meet standards as prescribed by applicable . . .

AFJROTC and Holm Center [HQ] instructions."  (AR 323-4 AJROTC 36-2002, § 1.1.3)

(emphasis added).  Here, Plaintiffs failed to follow HQ instructions even after they were warned,

in at least two emails they received, that failure might lead to decertification.  (*See* AR 153, 155-

56, 169).  Plaintiffs' decision to disregard these warnings undermines their argument that the

decertification decision was arbitrary or capricious.  *See Elk Assocs. Funding Corp. v. U.S. Small*

*Bus. Admin.*, 858 F. Supp. 2d 1, 24 (D.D.C. 2012) (rejecting motion for preliminary injunction

based on alleged APA and Due Process violations because, *inter alia*, the agency had afforded

the plaintiff "countless opportunities to come into compliance").

Finally, the court was not provided a copy of the email allegedly sent to Hoffman from the Chief of the Instructor Management Branch. But even if it had been part of the record, the email—without more—would not have been sufficient to establish that Plaintiffs were singled out for harsher treatment.

      i.   <u>Plaintiffs contend that because there was no finding of willfulness, the Air Force violated the APA by failing to allow Plaintiffs an opportunity to correct their alleged non-compliance prior to the decertification. (Pls. PI Br. pp. 13-14, 32-33).</u> [10]

Pursuant to 5 U.S.C. § 558(c), except where there is a finding of willfulness, "an agency must give a licensee an opportunity to demonstrate or achieve compliance with all lawful requirements before the agency withdraws, suspends, revokes, or annuls a license." *Atl. Richfield Co. v. United States*, 774 F.2d 1193, 1199 (D.C. Cir. 1985) (citing 5 U.S.C. § 558(c)); *see Fence Creek Cattle Co. v. U.S. Forest Serv.*, No. CIV 06-1236-SU, 2008 WL 4610272, at *7 (D. Or. Oct. 16, 2008) (citations omitted), *aff'd*, 602 F.3d 1125 (9th Cir. 2010). Plaintiffs contend the Air Force did not make a willfulness finding, nor could it have done so because Plaintiffs believed they were in compliance. Therefore, Plaintiffs argue, in the absence of such a finding, the Air Force violated § 558(c) of the APA by not providing them with an opportunity to "achieve compliance" before their certifications were revoked.

---

[10]  Plaintiffs rely on the following provisions of the APA: 5 U.S.C. § 558(c) ("Except in cases of willfulness . . . the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given . . . (1) notice by the agency in writing of the facts or conduct which may warrant the action; and (2) opportunity to demonstrate or achieve compliance with all lawful requirements."); 5 U.S.C. § 551(8) ("license" includes "an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."); 5 U.S.C. § 558(b) ("A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.").

Whether or not this provision applies to the facts presented here, Plaintiffs are unlikely to succeed on the merits of this claim. First, the record belies Plaintiffs' argument that the Air Force failed to provide Plaintiffs an opportunity to "achieve compliance" prior to decertification. *Fence Creek Cattle Company v. United States Forest Service*, No. CIV 06-1236-SU, 2008 WL 4610272, at *8 (D. Or. Oct. 16, 2008), *aff'd,* 602 F.3d 1125 (9th Cir. 2010) is instructive. There, plaintiffs argued that the Department of Agriculture ("DOA") violated their APA rights by revoking a grazing permit without allowing them an opportunity to achieve compliance. The court disagreed, noting:

> It was not until after several oral and written communications that agency action was taken. On numerous occasions, both informally and through written notice, plaintiff was apprised of the facts and conduct at issue and was given the opportunity to demonstrate that it had complied with the requirements of the grazing permit.

*Id.* *7.

Because they ignored the warnings, the plaintiffs in *Fence Creek* were unable to establish that the DOA violated § 558(c)'s prohibition against revoking a license prior to allowing the licensee an opportunity to cure. Plaintiffs here, like those in *Fence Creek*, were provided numerous notices of their non-compliance and were warned of potential negative consequences, yet ignored the warnings. Therefore, the court finds that Plaintiffs' argument that the Air Force violated § 558(c)'s prohibition on revoking a license prior to allowing a licensee to "achieve compliance" is unlikely to succeed on the merits.

Moreover, the court disagrees that the agency failed to make a willfulness finding. Indeed, while he did not quote the text of the instruction, Woods determined that Plaintiffs violated AFJROTC Instruction 36-2002 ¶ 3.1.2.2.5, which provides that "decertification may be a result of . . . [a]n incident of willful misconduct." (AR 336, 143; *see* AR 336, AFJROTC 36-

2002 ¶ 3.1.2; *id.*¶ 3.1.2.2).  On appeal, Hoffman found that Plaintiffs violated the same

instruction.  (AR 143).  Thus, the record establishes that the Air Force did make a willfulness

finding and Plaintiffs are not entitled to the protections of 5 U.S.C. § 558(c).

Plaintiffs are also incorrect that a willfulness finding is impossible because they believed

they were in compliance.  "[A] violation is 'willful' if the violator '(1) intentionally does an act

which is prohibited, [ ]irrespective of evil motive or reliance on erroneous advice, or (2) acts

with careless disregard of statutory requirements.'"  *Potato Sales Co. v. Dep't. of Agric.,* 92 F.3d

800, 805 (9th Cir. 1996) (citation omitted);  *see Schwebel v. Orrick*, 153 F. Supp. 701, 705

(D.D.C 1957) ("Willfulness . . . has been interpreted as meaning the intentional doing of the act

charged.") (citing *Air Transport Assocs. v. Civil Aeronautics Bd.*, 199 F.2d 181, 186 (1953)),

*aff''d on other grounds*, 251 F.2d 919 (D.C. Cir. 1958).  Because a willfulness finding does not

require evidence of ill intent, under the facts presented here it is irrelevant that Plaintiffs believed

they had legitimate reasons for failing to meet the suspense deadline or that they believed they

had already submitted the necessary documentation.  There is evidence that they "act[ed] with

careless disregard of [Air Force] requirements."  *Potato Sales Co,* 92 F.3d at 805.

> j.  <u>Plaintiffs allege that the Air Force failed to follow its own published guidelines
> for decertification, claiming:</u>

- The Air Force was required to consider "overall performance," including their
  school performance evaluations and letters of support from the school
  principal, prior to decertification, but failed to do so.  (Pls. PI Br. p. 36-39; *see*
  AR 440-475).

- The Air Force was required to complete a Form 98 evaluation prior to
  decertification, but failed to do so.  (Pls. Br. p. 26 n.18; *id*. pp. 36-39; Am.
  Compl. ¶ 203r).

Plaintiffs misread the cited instructions regarding decertification.  First, the instructions

allow for decertification either when the instructor's "overall performance . . . is unsatisfactory"

or when there is a finding of willfulness, as there was here. (AR 336, AFJROTC 36-2002 ¶ 3.1.2, ¶ 3.1.2.2; ¶ 3.1.2.2.5). Thus, there is no requirement that a consideration of "overall performance" precede a decertification decision.

With regard to the Air Force's failure to complete Form 98 prior to decertification, the Air Force considers the Form 98 and the associated performance review process "to be adequate protection for instructors from unfair evaluation" and a school official or the unit's senior ROTC officer "may initiate" a Form 98 when an instructor's "performance or conduct does not meet acceptable standards or is exemplary." (AR 337, AFJROTC 36-2002 ¶ 3.7.1; AR 339 AFJROTC 36-2002 ¶ 4.6.3.2.1.).

In support of their Form 98 argument, Plaintiffs first rely on AFJROTC 36-2002 ¶ 2.3.1, which provides:

> When a staff visit report, unit evaluation, or other official source of information (i.e., school or civil investigation) indicates the instructor's performance or conduct is less than overall Satisfactory; Holm Center/JR will inform school officials and request they consider taking corrective action, including evaluation of whether the continued employment of the instructor is appropriate. If school officials do not or are not able to take corrective measures, Holm Center will process the case [using one of two options].

(AR 334).

This provision, by its terms, appears inapplicable to the conduct at issue here because it seems to contemplate school related conduct that school officials are authorized to correct. And even if this case did involve such conduct, HQ's options do not require use of Form 98.

Plaintiffs next cite to AFJROTC 36-2002 ¶ 3.8, which involves "action before [d]ecertification," and which provides two distinct paths to decertification. (AR 338). Under paragraph one, if a "staff visit or other official source of information indicates the instructor's performance or conduct is overall unsatisfactory and corrective action directed by [HQ] or

school officials is insufficient to correct, [HQ] will process the case under 3.1.2,"—the instruction discussed above permitting decertification if there is a finding of willfulness. (AR 338 AFJROTC 36-2002 ¶ 3.8.1; AR 336, AFJROTC 36-2002 ¶ 3.1.2; ¶ 3.1.2.2.5).

Assuming *arguendo* that paragraph one applies here, HQ complied with its requirements. Specifically, HQ's attempted corrective action in the form of email notifications failed to bring about compliance. Because these efforts were "insufficient to correct" the problem, HQ made a willfulness finding and proceeded accordingly. It did not need to complete a Form 98 to process a decertification based on willfulness.

Paragraph two of AFJROTC 36-2002 ¶ 3.8 provides that HQ "will initiate action to decertify an instructor whenever it is required because of an Unsatisfactory rating on an AFJROTC Form 98." (AR 338). Thus, Form 98 is not required in order to initiate decertification under paragraph two; rather, decertification is mandated if the Form 98 evaluation and appeal process ends with an unsatisfactory rating. (*See id*.)

## 2. Summary

The court finds that the Plaintiffs' APA claim is not likely to succeed on the merits because the crux of that claim relies on arguments unsupported by the record, and because it asks this court to do what it is not permitted to do: "serve as a super correction board that reweighs the evidence," *Charette v. Walker*, 996 F. Supp. 43, 50 (D.D.C. 1998) (citation omitted), and "substitute its judgment for that of the military departments . . . ." *Christian v. United States*, 46 Fed. Cl. 793, 801 (2000) (citing *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed. Cir. 1983)).

## C.    Privacy Act

"The Privacy Act regulates the collection, maintenance, use, and dissemination of information about individuals by federal agencies." *Wilson v. Libby*, 535 F.3d 697, 707 (D.C.

Cir. 2008) (internal quotation marks and citations omitted).  The Act requires that agencies "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."  5 U.S.C. § 552a(e)(5).  An individual may request access to and amendment of an agency's records or information pertaining to him, *see id.* § 552a(d), and may file a civil action if the agency "makes a determination . . . not to amend an individual's record in accordance with his request" or if the agency fails to maintain accurate records about that person and the agency subsequently makes an adverse determination based on the inaccurate records.  *Id.* § 552a(g)(1)(A); 552a(g)(1)(C).

Plaintiffs bear the burden of proving any alleged violations of the Privacy Act were intentional or willful.  *See Albright v. United States,* 732 F.2d 181, 189 (D.C. Cir. 1984).  Here, Plaintiffs appear to argue that the Air Force violated the Privacy Act by maintaining inaccurate records associated with the misinformation regarding whether Regional Director Barron spoke with Plaintiffs via telephone about their late ADPE documents.

Plaintiffs' argument fails because "an agency need not keep perfect records, but must act reasonably to assure their accuracy."  *Dickson v. Office of Pers. Mgmt.,* 1991 WL 423968, at *15 (D.D.C. Aug. 27, 1991).  Here, the Air Force records contain an email from Barron conceding that he was mistaken and that he did not speak with Plaintiffs about the ADPE compliance deadlines.  (AR 495, 508).  Thus, the inaccurate information was corrected, Plaintiffs discussed the correction in their appeal and, as noted above, there is no indication that Hoffman relied on this misinformation when she considered the appeal.  Thus, Plaintiffs have not established that the Air Force violated the Privacy Act by engaging in willful or intentional conduct by failing to

"assure fairness in any determination relating to [Plaintiffs'] qualifications, character, rights . . .

or benefits."  5 U.S.C. § 552a(g)(1)(C).[11]

### D.        Due Process Claim

Plaintiffs contend that the initial decertification decision violated their due process

rights because Woods allegedly held a secret hearing, declined to provide Plaintiffs evidence

supporting the decertification decision and denied them an opportunity to confront "false

evidence."  (Pls. PI Br. pp. 6-8 & n.7).  As discussed above, these allegations are not supported

by the record.  Thus, Plaintiffs are unlikely to succeed on the merits of their due process claim,

as it relates to these allegations.

Next, Plaintiffs contend that the Air Force failed to provide Plaintiffs with an

opportunity to be heard before they were decertified.  Assuming for the purposes of argument

---

[11]   To the extent Plaintiffs allege violations of the Privacy Act over the inclusion of documents
in the record containing "gossip collected off the internet," Plaintiffs are unlikely to succeed on
the merits.  (*See* Pls. PI SOF # 19).  Plaintiffs point out that the record contains an email dated
July 13, 2015 from Woods to an unidentified "team."  (AR 496-502).  Included in the email is
what Woods described as "antidotal [sic] information," consisting of: (1) an article about an
interview Colley apparently gave to a local media outlet regarding the decertification; and (2)
apparent social media comments posted on the Facebook page for the media outlet that published
the article.

Under the Privacy Act, opinions do not constitute "inaccurate" information.  *See Allmon v.
Fed. Bureau of Prisons*, 605 F. Supp. 2d 1, 7 (D.D.C. 2009) ("The Privacy Act is not a means to
challenge . . .  opinions or judgments . . . .") (citations omitted); *Graham v. Hawk,* 857 F. Supp.
38, 40 (W.D. Tenn. 1994) ("[R]ecords are maintained with adequate fairness if they accurately
reflect the nature of the evidence," *i.e.,* indicate that the information is a hearsay report from an
unnamed informant.), *aff'd,* 59 F.3d 170 (6th Cir. 1995);  *Kleiman v. Dep't. of Energy*, 956 F.2d
335, 337-38 (D.C. Cir. 1992) ("[T]he Privacy Act allows for amendment of factual or historical
errors[, the statute] is not . . . a vehicle for amending the judgments of federal officials or others
as those judgments are reflected in records maintained by federal agencies.")  (emphasis in
original) (alterations and some citations omitted) (citing *Rogers v. United States Dep't of Labor,*
607 F. Supp. 697, 699 (N.D. Cal. 1985)).

Moreover, the emails containing these opinions were sent after Hoffman denied Plaintiffs'
appeal, and could not have tainted the administrative process.  (*See* AR 496-502).

that Plaintiffs had a constitutionally protected interest in their certifications,[12] their due process claim is still unlikely to succeed on the merits. Due process requires that an aggrieved party be allowed an opportunity to be heard prior to the effective date of the alleged deprivation. *See, e.g.*, *Opp Cotton Mills v. Adm'r of Wage & Hour Div. of Dep't of Labor*, 312 U.S. 126, 152–53 (1941) ("The demands of due process do not require a[n opportunity to be heard], at the initial stage or at any particular point or at more than one point in an administrative proceeding so long as the [opportunity to be heard] is [permitted] before the final order <u>becomes effective</u>.") (emphasis added); *Myersville Citizens for a Rural Cmty., Inc. v. F.E.R.C.*, 783 F.3d 1301, 1327 (D.C. Cir. 2015) ("[A] rebuttal opportunity that arises before the issuance of a final order is sufficient for purposes of due process."); *Brown v. United States*, 367 F.2d 907, 911 (10th Cir. 1966) ("It is sufficient to satisfy the demands of due process if a[n opportunity to be heard] is provided for <u>before a final order becomes effective</u>.") (emphasis added). In order to ensure that the opportunity to be heard serves "its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented," and here, Plaintiffs were allowed this opportunity via the appeal process prior to the effective date of the decertification. *See Ford Motor Co. v. Coleman*, 402 F. Supp. 475, 496 (D.D.C. 1975). Accordingly, Plaintiffs are not likely to succeed on the merits of this due process claim.

---

[12] Plaintiffs are unlikely to: (1) demonstrate a property interest sufficient to trigger due process protections; or (2) show a constitutionally protected liberty interest. *See Crooks v. Mabus*, 845 F.3d 412, 418–19 (D.C. Cir. 2016) (examining Navy ROTC regulations and finding no protected property interest and a doubtful liberty interest where former ROTC instructor challenged decertification). In any event, the court need not reach these issues given its finding that Plaintiffs are unlikely to succeed with their argument that the Air Force's decertification procedures failed to comply with due process.

### E. FTCA

Plaintiffs did not address the likelihood of success on their FTCA claim. Therefore, the court finds that Plaintiffs have not met their burden with respect to this claim.

### F. Jurisdiction Over Plaintiffs' Remaining Arguments and Claims

In their Motion for Preliminary Injunction, Plaintiffs raised claims that did not appear in their Amended Complaint. For example, Plaintiffs' Motion challenges the Air Force's authority to decertify them because, in their view, no statutory or regulatory authority for decertification of JROTC instructors exists. (*See* Pls. PI Br. pp. 14-26; *see id*. p. 16) Plaintiffs also argue that the AFJROTC instructions are unenforceable because they constitute "regulations" that were not properly promulgated through notice and comment. (*Id*. pp. 27-32).

"For jurisdiction to exist over the instant motion for injunctive relief, the motion must be closely related to the facts, legal issues, and parties addressed in the plaintiffs' amended complaint[]." *Adair v. England*, 193 F. Supp. 2d 196, 201 (D.D.C. 2002) (citation omitted). Here, Plaintiffs' challenges to the statutory authority for decertification and to the legitimacy of the AFJROTC regulations are not "closely related" to the claims or legal issues raised in their Amended Complaint. Accordingly, the court is without jurisdiction to consider the additional arguments raised for the first time in their motion for injunctive relief.

## 2. REMAINING INJUNCTIVE RELIEF FACTORS

Having found that Plaintiffs are not likely to succeed on the merits, the court must also consider whether: (1) Plaintiffs would suffer irreparable injury absent the requested injunctive relief; (2) the injunctive relief would further the public interest; and (3) the balance of equities tips in favor of the Plaintiffs. *Winter*, 555 U.S. at 20. Courts in this Circuit have used a "sliding scale" approach in analyzing these factors, meaning a particularly strong showing in one could

outweigh weakness in another. *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011). However, it is unclear whether this approach survives after the Supreme Court's ruling in *Winter v. Natural Resources Defense Council, Incorporated,* 555 U.S. 7 (2008), which "suggests if not . . . hold[s] 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393.

Under either approach, however, the court finds that Plaintiffs are not entitled to preliminary relief, as they are unable to meet the *Winter* test because they are unlikely to succeed on the merits, and because, under the "sliding scale" approach, the equities tip in favor of denying preliminary relief.

### A. Public Interest

Although Plaintiffs have proffered evidence of some public support for their case, the court finds that the public interest would not be served by granting injunctive relief because the impact of Plaintiffs' failure to follow directives from HQ is significant. The public has an interest in the manner in which the military is represented, and in the perception and appreciation of its adherence to and compliance with regulations and orders, even by those serving in a civilian capacity.

### B. Irreparable Harm

Plaintiffs argue that, given the revocation of their AFJROTC certifications, they face imminent irreparable harm because their teaching certifications will be revoked. The school district sent each Plaintiff a "Notice of Intent to Dismiss," informing them that the loss of their JROTC certifications has made them "unemployable" by the school system. (ECF 20, Pls. First PI Br. at ECF pp. 55, 79). Subsequently, the California Commission on Professional

Competence scheduled a hearing for May 23, 2017 to consider terminating Colley due to his failure to maintain his JROTC certification. (ECF No. 23, Pls. Mot. for Tele. Status p. 3).[13]

The court finds that the anticipated loss of the teaching certifications is not an irreparable injury. Assuming the California Commission revokes their teaching credentials, Plaintiffs have not shown that they would be unable to regain those credentials and regain employment with the school district upon reinstatement of their certifications. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (noting that "the injury must be beyond remediation"); *Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014) (finding no irreparable harm because plaintiff had "no concrete proof that the vacancy for Deputy Assistant or some other comparable position will not be available when [the litigation] ultimately resolved.").

In contrast, there is evidence that, without injunctive relief, Plaintiffs would suffer financial harm because they have no legal recourse to recoup their lost salaries from either the state or the Air Force.[14] However, the loss of employment income does not necessarily establish irreparable harm—even when the loss is unrecoverable. In *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) the Supreme Court noted in *dicta* that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." The Court cautioned, however, "[s]uch extraordinary cases are hard to define in advance of their occurrence." *Id*. The court finds that this is not such an extraordinary case, especially given that

---

[13] It is not clear whether a hearing has been set on Malcomb's teaching certification.

[14] Despite demanding lost pay and benefits in their Amended Complaint, Plaintiffs admit that the APA does not provide for of monetary damages. (*See* Am. Compl. ¶ 245; ECF No. 16, Pls. First PI Br. p. 3).

Plaintiffs are retired military officers who appear able to seek other employment. *See Billington*, 76 F. Supp. 3d at 65-66 (finding plaintiff's inability to recover back pay from his former employer at his primary job did not constitute irreparable harm for preliminary injunction purposes where plaintiff still received a military pension, as well as income from a second job).

### C. Balancing of the Equities

In balancing the equities, the court "weighs the harm to [Plaintiff] if there is no injunction against the harm to the [Defendant] if there is." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Winter*, 555 U.S. at 25-26). Here, "the [Defendant's] harm and the public interest are one and the same, because the government's interest is the public interest." *Pursuing America's Greatness*, 831 F.3d at 511 (emphasis in original) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In other words, "in the context of a stay, assessing the harm to the opposing party and weighing the public interest 'merge when the Government is the opposing party.'" *Pursuing America's Greatness*, 831 F.3d at 511 (quoting *Nken*, 556 U.S. at 435).

Applying this standard, the court finds that balancing the equities supports denying injunctive relief because: (1) Plaintiffs are unlikely to succeed on the merits; (2) Plaintiffs have not established that they will suffer irreparable harm; and (3) the public interest will not be served, and may in fact be harmed by forcing the Air Force to temporarily reinstate Plaintiffs' certifications. Moreover, there is legal authority indicating that a governmental entity may be harmed where an injunction would require it to welcome back an expelled individual, because doing so would "undermin[e] the authority of the [entity] to take disciplinary action for what it believed to be a serious threat to . . . property." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 826–27 (7th Cir. 1998) (denying preliminary injunction to expelled student whom

school officials accused of endangering school property after he distributed, on campus, copies of his publication explaining how to hack the schools' computers).

Finally, the D.C. Circuit has warned that under normal circumstances, "a preliminary injunction should not work to give a party essentially the full relief he seeks on the merits" and preliminary relief here would do just that. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) (citing *Selchow & Righter Co. v. Western Printing & Lithographing Co.*, 112 F.2d 430 (7th Cir. 1940)). Accordingly, the court finds that a preliminary injunction is not appropriate in this case and will deny the motion.

## C. VENUE

### 1. LEGAL STANDARD

Plaintiffs' APA and constitutional claims are governed by the general federal venue provision 28 U.S.C.A. § 1391,[15] under which a civil action against either the United States or one of its officials acting in her official capacity may be brought

> in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C.A. § 1391(e)(1). In this case, the named individual defendants involved in the decertification and appeal—Woods and Hoffman—reside in Alabama, and a substantial part of the events giving rise to this action occurred there, as well as in California, where Plaintiffs are located. Thus, under the general venue provision, venue in either state is appropriate.

---

[15] As noted above, Plaintiffs have not asserted any facts to support a Privacy Act claim. Therefore, the Privacy Act's venue statute—which specifically provides for venue in the District of Columbia—does not factor into the court's analysis. Even if the court were to consider the Privacy Act venue statute, the court still has the authority to transfer venue under 28 U.S.C. § 1406.

FTCA claims "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." *Patel v. Phillips,* 933 F. Supp. 2d 153, 165 (D.D.C. 2013) (quoting 28 U.S.C. § 1402(b)). Thus, under the FTCA, venue is also appropriate in either Alabama or California.

Although the only connection to the District of Columbia appears to be that the Secretary of the Army is located nearby at the Pentagon, in Virginia, and her official address is in the District of Columbia (ECF No. 12, Defs. Reply p. 1 & n.1), the Air Force did not argue in its opening brief that venue is improper in this district, but instead urged the court to transfer the case pursuant to 28 U.S.C. § 1404. In its reply, however, the Air Force argued that venue in this district is improper, (ECF No. 12, Defs. Reply pp. 1-4), but still failed to cite to 28 U.S.C. § 1406, the appropriate provision governing actions filed in the wrong venue, and which states:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C.A. § 1406(a). While this provision allows for dismissal of a case filed in the wrong venue, the Air Force has not requested dismissal, but instead transfer under Section 1404, preferably to Alabama or California. [16]

In deciding a Section 1404(a) venue motion, a court must first determine whether the transferee district is one where the action "might have been brought." 28 U.S.C. § 1404(a). As

---

[16] Even if the Air Force had requested dismissal, the court would have denied the request because, *inter alia*, the Air Force did not raise the venue argument in its principal brief, and therefore waived it. *See* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required"). Additionally, dismissal would not serve the interests of justice.

discussed above, venue in either Alabama or California is proper in light of Plaintiffs' claims, and both these options satisfy the requirements of Section 1404.

Next, the court must consider "the convenience of the parties and witnesses," as well as "the interest of justice" when considering transfer. 28 U.S.C. § 1404(a). While the

> convenience of the parties, convenience of the witnesses, and the interests of justice are the three principal factors to consider in determining whether to transfer a case, courts have also considered various other factors, including the private interests of the parties and the public interests of the court, as additional considerations 'protected by the language of [the change of venue statute].

*Valley Cmty. Pres. Comm'n v. Mineta*, 231 F. Supp. 2d 23, 44 (D.D.C. 2002) (citation omitted). The statute "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration.'" *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988) (citation omitted). "When the events occur in more than one district, a court can consider which jurisdiction has the stronger factual nexus to the claims." *Miller v. Insulation Contractors, Inc.,* 608 F. Supp. 2d 97, 102 (D.D.C. 2009) (citation omitted).

## 2. ANALYSIS

### A. Private Interest Factors

In deciding whether to transfer a case, a court considers six "private interest" factors:

> 1) the plaintiff's choice of forum; 2) the defendant's choice of forum; 3) whether the claim arose elsewhere; 4) the convenience of the parties; 5) the convenience of the witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts; and 6) the ease of access to sources of proof.

*Louis v. Hagel*, 177 F. Supp. 3d 401, 406 (D.D.C. 2016) (citations omitted). Defendants argue that four of the six private interest factors support venue in Alabama or California: (1) defendant's preferred forum; (2) location where the claim arose; (3) convenience of the parties; and (4) ease of access to sources of proof.

The court agrees that two of Defendants' factors undoubtedly weigh in favor of transfer to Alabama or California: defendants' preferred forum and location where the claim arose. In contrast, the convenience of the parties does not necessarily weigh heavily in favor of any district because Plaintiffs contend, and the Air Force does not dispute, that the case will be decided on the administrative record. (ECF No. 10, Pls. Resp. to Defs. Mot. to Dismiss p. 95). On the other hand, this factor might come into play if a court determined that a hearing was necessary and ordered the parties to appear in person. While such a scenario is unlikely, were it to materialize in this district, both sides would be inconvenienced. On the other hand, if a hearing were held in California, the Air Force might be inconvenienced, while a hearing in Alabama would inconvenience the Plaintiffs. Although Plaintiffs are retired from the military, they assert that they are experiencing "substantial financial hardship." (ECF No. 13, Pls. Sur-reply p. 4). Consequently, the court finds that the convenience of the parties factor tips in favor of transfer to California.

The court disagrees that the ease of access to proof factor weighs in favor of transfer. Although the Air Force contends that records in this case are located in Alabama (*see* ECF No. 6, Defs. Mot. to Dismiss p. 44), that fact alone is of lesser significance given that the decision will be largely based on the record. Although neither side addressed it, the convenience of the witnesses factor likewise does not weigh in favor of either side for the same reason.

With respect to the final private interest factor, Plaintiffs are correct that their choice of forum is ordinarily accorded "substantial deference." *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998) (citing *Gross v. Owen,* 221 F.2d 94, 95 (D.C. Cir. 1955)). That deference is lessened here, however, because Plaintiffs do not reside in this district and "the relevant events occurred elsewhere." *Id*. (citation omitted). Additionally, there is no

reason to defer to the Plaintiffs' choice of forum, since this case does not involve "a national issue [in which] federal officials in the District of Columbia had significant involvement in the agency action." *Intrepid Potash-New Mexico, LLC v. U.S. Dep't of Interior*, 669 F. Supp. 2d 88, 96 (D.D.C. 2009); *see Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 67 (D.D.C. 2003) (citation omitted) (refusing to give deference to plaintiff's choice of forum because the District of Columbia had "no meaningful ties to the controversy and no particular interest in the parties or subject matter" where the dispute involved Florida environmental laws).

Accordingly, on balance, two private interest factors (defendant's choice of forum and location where the action arose) heavily favor transfer to Alabama or California, and the convenience of the parties factor slightly weighs in favor of transfer to California. The three remaining private interest factors do not weigh in favor of any district, but the court notes that Plaintiffs have indicated a preference for transfer to California should the court grant the Air Force's motion. (Pls. Response to Defs. Mot. to Dismiss p. 95).

## B. Public Interest Factors

Next, the court must consider the following "public interest" factors:

(1) the transferee forum's familiarity with the governing laws . . .; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Louis*, 177 F. Supp. 3d at 408 (citations omitted). Defendants contend, without elaboration, that "at least two" factors weigh in favor of transfer: the transferee's familiarity with the governing law and the local interest in deciding local controversies at home. Plaintiffs likewise did not address these factors, but argue that transfer will further delay the case and increase their financial losses.

Applying the public interest factors, the court disagrees with Defendants' argument regarding the transferee's familiarity with the governing law factor. With respect to "adjudication of federal claims, . . . the federal courts comprise a single system in which each tribunal endeavors to apply a single body of law." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (citation and alterations omitted), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989). This court has no reason to diverge from "the principle that the transferee federal court is competent to decide federal issues correctly." *Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) (citations omitted). Consequently, the familiarity with the governing law factor does not weigh in favor of either party.

Without any evidence of the "relative congestion of the calendars" in the potential districts, this factor does not favor venue in any particular district. Moreover, Plaintiffs' argument that transfer would unduly delay the resolution of the case is based solely on speculation.

With respect to the final factor, "local interest in deciding local controversies at home," the court agrees that transfer is appropriate. The California Commission on Professional Competence has scheduled a hearing to consider terminating Colley, and the Hart School District claims in its "Notice of Intent to Dismiss" that the loss of the JROTC certifications has made Plaintiffs "unemployable" by the school system. (ECF No. 23, Pls. Mot. for Tel. Status p. 3; Pls. PI Br. at ECF pp. 55, 79). Thus, the outcome of this litigation will directly impact citizens of California. *See Intrepid Potash-New Mexico, LLC*, 669 F. Supp. 2d at 98-99 (transferring case after finding that controversy involving approval of permits to drill oil and gas was "more local in nature and centered on New Mexico [rather] than on the District of Columbia"). Moreover,

there has been media coverage in California regarding the case, and state residents have expressed strong opinions on the matter.

Therefore, weighing the private interest factors and the public interest factors, the court finds that the balance tips in favor of transfer to California. Plaintiffs reside in California, it is the Air Force's preferred choice of forum, and some of the conduct at issue occurred there. California may be a more convenient forum for the Plaintiffs, and the residents of that state undoubtedly have a considerable "local interest in deciding local controversies at home." *See Bergmann v. U.S. Dep't of Transp.*, 710 F. Supp. 2d 65, 75 (D.D.C. 2010) (transferring case to Michigan because, *inter alia*, "there can be no doubt that the [highway construction] projects at issue in this case will directly affect the lives of Michigan residents").

Conversely, there is nothing in the record indicating that the parties or the facts at issue are connected to this district. *See Miller v. Insulation Contractors, Inc.,* 608 F. Supp. 2d 97, 102 (D.D.C. 2009) (citations omitted) ("When the events occur in more than one district, a court can consider which jurisdiction has the stronger factual nexus to the claims.").

As the District of Columbia Circuit has warned:

> Courts in this circuit must examine challenges to . . . venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia. By naming high government officials as defendants, a plaintiff could bring a suit here that properly should be pursued elsewhere.

*Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). Given this admonition, and the private/public interest factors that weigh in favor of transfer, this court finds that the interests of justice will be served by transferring this action to the Central District of California.

### D. CONCLUSION

For the reasons set forth above, the court will DENY Plaintiffs' motions and GRANT

Defendants' motion to transfer this case to California.

Date:  May 15, 2017

> *Tanya S. Chutkan*
> TANYA S. CHUTKAN
> United States District Judge